IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


ERNEST E. ELLISON AND
THERESA SIMMONS-ELLISON                           PLAINTIFFS

v.                      Case No. 11-5070

WAL-MART STORES, INC.                             DEFENDANT


### MEMORANDUM OPINION AND ORDER

Before the Court are Defendant Wal-Mart Stores, Inc.'s ("Walmart") Motion for Summary Judgment (Doc. 17), Brief in Support (Doc. 18) and Statement of Undisputed Facts (Doc. 19) and Plaintiffs' Response (Doc. 22), Supplements (Docs. 23-24) and Statement of Facts (Doc. 25). Plaintiff Theresa Simmons-Ellison (hereinafter "Simmons") alleges sex discrimination and retaliation pursuant to Title VII of the Civil Rights Act and the Arkansas Civil Rights Act, Ark. Code Ann. § 16-123-101 *et seq*. Plaintiff Ernest E. Ellison (hereinafter "Ellison") alleges retaliation under the same statutes. For reasons stated herein, Defendant's Motion for Summary Judgment (Doc. 17) is **GRANTED** and Plaintiffs' complaint (Doc. 1) is **DISMISSED WITH PREJUDICE.**

## I. Background

Defendant Wal-Mart Stores, Inc. ("Walmart") has three Optical Labs which manufacture lenses for eyeglasses and

1

assemble the lenses into frames which are sold in Walmart's Vision Centers located in its stores.  The U.S. labs are located in Fayetteville, Arkansas; Dallas, Texas; and Crawfordsville, Indiana.  There is one so called "Call Center" for all three labs and it is located in the same facility as the Fayetteville Optical Lab.  The Call Center handles calls from all the Vision Centers and from customers of the Vision Centers.  Although they are housed in the same facility, the employees of the Optical Lab and the Call Center have different reporting structures. (Docs. 19 & 25, ¶ 1).

Plaintiff Eugene Ellison ("Ellison") worked for Walmart as the Call Center Manager for the Walmart Optical Labs.  Ellison became the Call Center Manager sometime in June of 2004.  (Docs. 19 & 25, ¶ 2).  Beginning in 2009, Ellison's manager was David Finley, Senior Manager of Quality Assurance for Optical. Finley's title was later changed to Senior Manager of Quality Assurance for non-store operations.  Finley reported to Volker Heimeshoff, Division Manager, Health & Wellness Non-Store operations.  (Docs. 19 & 25, ¶ 3).

Plaintiff Theresa Simmons-Ellison ("Simmons") worked for Walmart since 2001, and held the position of Training Manager in the Sanger, Texas Distribution Facility.  On February 8, 2010, she became the Human Resource Office Manager ("HROM") for the Fayetteville Optical Lab.  Although the position had existed

within Walmart for several years, Simmons was the first person to hold the HROM position at the Optical Lab, and a written job description for this position was not created until after her dismissal. (Docs. 19 & 25, ¶ 4, 6). Simmons reported to Human Resources Manager Linda Braun, who in turn reported to Rick Carlson[1], Senior Human Resource Manager, whose office was located in Bentonville, Arkansas. Carlson reported to David Scott, Senior Director of Human Resources, also in Bentonville. (Docs. 19 & 25, ¶ 5).

Within two weeks of arriving at the Fayetteville Optical Lab/Call Center, Simmons contends rumors developed that she and Ellison were in a romantic relationship. (Docs. 19 & 25, ¶ 13). Home Office Manager Steve Proffitt allegedly asked Ellison if he was "hittin that" ("hitting," an euphemism for sexual relations; "that" referring to Simmons.) Proffitt supposedly made other "insinuations" that Simmons and Ellison were "hanging out together a lot." When Simmons confronted Proffitt about such

---

[1] Walmart contends that because Rick Carlson is located in the Walmart home office in Bentonville and Linda Braun, his direct report, is physically located in the Fayetteville Optical Lab which also houses the Call Center, Carlson had delegated the day to day Human Resource matters for the Call Center to Braun in addition to her responsibilities for the Optical Lab. Therefore, they maintain, Simmons's duties also included human resource support for the Call Center. (Doc.18). Simmons disputes this contention, insisting that WalMart has not defined "support." (Doc. 25).

comments, he apologized and promised not to talk about it anymore. (Doc. 17-1, Simmons's Deposition pp. 23-25).

Plaintiff contends Co-Manager Don Hawkins asked another manager about any Simmons-Ellison relationship and relayed to her that he had witnessed Ellison picking Simmons up at mealtime--on his day off. (Doc. 17-2, Ellison's 10/7/10 statement). Plaintiff also contends that Braun, Simmons's supervisor, told Simmons that she was not allowed to have friendships with the managers in the lab "because of [her] position in HR." (Doc. 17-1, Simmons's Deposition p. 33). Simmons admits that she was spending a lot of time with Ellison, but insists Ellison was only helping her get some "system issues straightened out." (Doc. 17-1, p. 31).

Within the next few weeks, Ellison moved out of his home and Simmons asked Braun if it would be alright for Ellison to rent a room from her. Braun told her they could not live in the same house because it "might upset one of his (Ellison's) associates; they might not feel comfortable coming to you." (Doc. 17-1, p. 21). Braun further told her that even the perception[2] by other employees that Simmons and Ellison were in a

---

[2] The Court's use of the term "perception" several times is not by accident. In both plaintiffs' deposition testimonies they describe this as the word used by Walmart management to explain why they were not allowed to be romantically involved or have it appear as though they were romantically involved. "No one

relationship, or even friends, should be avoided, and for that reason they should not go to lunch together or take breaks together.  (Doc. 17-1, p. 21).   When Simmons went to Braun complaining of the "gossip, innuendo and sexist remarks," Braun told Simmons and Ellison that they were "just going to have to outrun this[3]."  (Doc. 1).

In her deposition, Simmons testified that early in April, she and Ellison attended a training session facilitated by Rueben Perez, Director, HR Investigations.  (Doc. 22-6, p. 18). Because "such a ruckus had been made about [her] relationship with [Ellison]," Simmons asked Perez a "hypothetical question regarding the fact that the leadership in the lab seemed to be so unhappy about the friendship that had formed between [them]." Simmons discussed with Perez "policies that--in writing explicitly stating certain things, was there some way to override those without some written clarification."  He said: "No.  If it's in policy, it's policy." (Doc. 22-6, p. 18).

---

discussed 'policy' with them, but 'perceptions' were discussed." (Doc. 17-1, p. 87).
[3]Braun describes the conversation a little differently, stating in her deposition that senior leaders and associates in the building were coming by her office and asking if there was a relationship between Simmons and Ellison.  Braun testified that when the rumors got back to Simmons, Braun told her "It's very difficult to outrun a perception, so you have to make it extremely hard for people to have any fodder to talk about." (Doc. 22-1).  For purposes of Summary Judgment only, the Court assumes Simmons's account is accurate.

On April 30, Ellison moved in with Simmons and on May 1, Ellison and Simmons married. No one at Walmart was advised of the marriage.

According to his deposition testimony, Ellison's supervisor, David Finley, came to the lab and told Ellison that he had talked to Rick Carlson, Senior Human Resource Manager, about the relationship between Simmons and Ellison and the perception it was causing. (Doc. 22-5 pp. 27-28). According to Ellison, Finley said, "I am sure you would not want to do anything to jeopardize Theresa's position and she would not want to jeopardize yours.[4]" (Doc. 17-2, Ellison's 10/7/10 statement.)

Ellison told his supervisor that he and Simmons were just "friends" and there was no policy against being friends. Simmons assured Finley that he would make an effort to "minimize [their] time together in the facility that was not required to perform [his] job duties, but [he] did not say that [he] would not see her away from work as friends." (Doc. 17-2). It was at this time, according to Simmons, that he began to feel that Ellison and he were being treated differently than other managers.

---

[4] In Ellison's written statement of October 7, 2010 (Doc. 17-2), he said this conversation happened in May, but in his deposition, Ellison testified that Finley talked to him in March.

After Ellison made the arrangement with Finley, he went to Simmons and told her about it.  Simmons went to her supervisor, Braun, and offered to make a similar one; she agreed that she would not acknowledge a relationship with Ellison while they were in the building together.

On May 12, 2010, Simmons received a verbal Coaching for Improvement[5] from Braun regarding Simmons's recent role in the discipline of an associate.  The Coaching stated:

> Theresa is still very new at the HROM role and is still learning all processes.  There are some things that Theresa needs to focus on for her to be successful in her role at 9149.  Encourage the Open Door, Meet all Deadlines, Make decisions based on facts, not emotion, keep any negativity about work processes between her and her manager.  I am confident that Theresa will focus on these opportunities and turn them around quickly.

Braun noted on the form that Simmons's performance resulted in decreased morale and could possibly have an effect on turnover numbers.

The expected performance was that Simmons "walk the floor on a regular basis, let the shift managers know if you will be out of the building for an extended period of time (lunch/errands), let AP know when you leave [and] what time to expect you back, meet all deadlines."  (Doc. 17-2, Ex. 8).

---

[5] Simmons believes this write-up was unfair and "in retaliation" for enforcing Walmart's policy prohibiting smoking within 50 feet of the entrance.  (Doc. 26-6, p. 41).

In mid-May[6], well after they were married, Ellison went to Simmons's supervisor and told her he "would like to pursue a relationship with Theresa...and since it seemed to be creating such a stir...", he asked Braun for assistance in finding another position within the company.   (Doc. 17-2, p. 80). Shortly thereafter Simmons went to Braun and said, "Regardless of the nature of our relationship in the building, if it is causing a problem, can you help Gene get a transfer?" (Doc. 17-1, p. 36).   According to Ellison, Braun's assistance was minimal and did not result in finding a position outside the Optical Lab/Call Center.   At no time did Ellison or Simmons advise anyone they worked with that they had married in May.

On Friday, September 10, 2010, Simmons received a written Coaching for Improvement from Braun, stating that there had been little improvement in the areas that were discussed during the verbal coaching in May.   "Theresa needs to make immediate improvement in her areas of responsibility (i.e. HR admin, Associate engagement)."   The effects of her performance were noted to include "associate morale, decreased productivity, impact on her team's ability to trust her."   Braun indicated the need for Simmons to own all aspects of her business and "be available not only to the managers but to the associates in the

---

[6] Ellison wrote that this discussion in June, but Simmons says it was April or May.

facility." She was advised to follow through on her commitments and that if she did not improve in 30 days, she would receive further coaching and demotion. (Doc. 17-2, Ex. 9).

The following Monday morning, September 13, 2010, Simmons sent an e-mail to Reuben Perez, HR Investigations Director[7], detailing what she described as the "egregious circumstance" of the behavior to which she had been forced to endure over the last seven months. (Doc. 17-2, Ex. 10). Attached to her email was a numbered list[8] of events that represented an outline of her "very unfortunate experiences[9] as the Human Resource Office Manager at the Fayetteville Optical Lab." (Doc. 23-12). Simmons complained generally and specifically about the "inappropriate speculation and gossip" about whether she and Ellison had a relationship; that other managers were friends with managers and subordinates; that she did not think either of her two coaching

---

[7] Simmons's email initiated Walmart's "Open Door" process, by which associates are to resolve employment concerns and complaints. (Doc. 18). Simmons explained in her email that she was making her complaint "so high up the chain of command" because the people to whom she would normally report were the subjects of her complaint and she had no confidence that her complaint would be given an unbiased investigation by them. (Doc. 23-13).

[8] Simmons's statement was seven pages long and consisted of 66 numbered paragraphs. (Doc. 23-12).

[9] In her deposition, Simmons describes her Open Door complaint as "claims of sexual harassment and discrimination." (Doc. 17-1, p. 93). The Court notes that Walmart's definition of harassment includes "making offensive comments about an individual's status, appearance, or sexual activity." (Doc. 24-15). Simmons alleged disparate treatment, not sexual harassment, in her complaint.

forms were warranted[10]; that Braun was the cause of her missing a deadline leading to her second coaching; that Braun had told her she was responsible for HR in the building, making Simmons responsible for Braun's job; that a manager called her a liar when she tried to explain why a coaching was not warranted; that she had been "threatened and treated without regard."  In conclusion, Simmons requested a transfer to a different facility or a different position, "based on [her] qualifications."  (Doc. 23-12).

What occurred next is the subject of some dispute.  Walmart contends that it properly investigated Simmons's Open Door complaint and addressed the issues Simmons complained about. During the investigation both Simmons and Ellison finally admitted that they were in a romantic relationship. Senior Director of Human Resources David Scott determined that both had been told that a romantic relationship between them was in violation of Walmart policy.  Both were given a Coaching for Improvement[11], removed from their respective positions in the

---

[10] Of her lengthy Open Door complaint, over four pages are dedicated to describing grievances that had nothing to do with her suspected relationship with Ellison.  (Doc. 17-2 pp. 10 – 14).

[11] Ellison's Coaching for Improvement Form states that "Gene is involved in a relationship with another Associate in the Fayetteville Optical Lab building which is against company policy.  He was informed that this is against policy on two occasions and did not admit come forward (sic) to his supervisor when the relationship developed into a romantic relationship."

Optical Lab/Call Center facility, and ultimately given sixty days leave to find another job within Walmart. When neither found a position, both were terminated effective December 31, 2010. (Doc. 17, ¶ 4). Ellison and Simmons contend that when Scott met with them, instead of questioning them about Simmons's "allegations of sex discrimination[12]," he focused on the relationship between the two employees. When Ellison demanded to see a copy of Walmart's "Romantic Relationship" policy, Scott allegedly told her "Not everything we do is in writing." (Doc. 1).

After Scott's decision, Ellison initiated an Open Door with Volker Heimeshoff. Heimeshoff upheld Scott's decision, but granted Simmons and Ellison paid leave rather than unpaid leave[13] while they looked for another position within Walmart. Simmons initiated an Open Door request with Scott's manager, Bryan

---

Under Associate's Comments, Ellison wrote, "No comment." (Doc. 24-1). Simmons's Form has the identical charge, but she wrote on hers "I deny that this is based in fact." (Doc. 24-2).
[12] Nowhere in the statement does Simmons give any indication that she felt she was being treated differently because of her gender. The closest is in paragraph 10: "In yet another conversation with Don, in the HRM's office, I was forced to again discuss the nature of my relationship with Gene and was told by Don at that time that the fact that I was a woman and Gene was a man made him very uncomfortable about our relationship. I continued to assure them that there was nothing inappropriate going on. It was quite humiliating. I felt dirty." (Doc. 23-12).
[13] Plaintiffs were originally given 30 days of unpaid leave to find another job within Walmart. The leave period was extended through the appeal process, and eventually changed to paid leave. (Doc. 18).

Miller, Senior Vice President Walmart U.S. Human Resources. Miller did not overturn Scott's decision. Simmons also pursued an Open Door with Susan Chambers, Executive Vice President, Global People Division. Simmons spoke with Karen Churchman and Jill Wesbecher. Simmons appealed to Mike Duke, President and Chief Executive Officer of Walmart. Dale Henry handled the appeal and did not overturn Scott's decision. Finally, Simmons appealed to Gisel Ruiz, Executive Vice President, People, Walmart U.S., who told her that the matter had already been reviewed. (Doc. 19).

After the appeals process at Walmart proved unsuccessful and they were terminated, Ellison and Simmons filed charges of sex discrimination and retaliation with the EEOC on February 7, 2011. Plaintiffs each received Dismissals and Notices of Rights. Walmart was first made aware that Ellison and Simmons were married when the plaintiffs filed their complaint in this Court, alleging sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, and the Arkansas Civil Rights Act.

## II.  Standard of Review

Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

12

material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. If the moving party meets the initial burden, the burden then shifts to the opposing party to produce evidence of the existence of a genuine issue for trial. *Id*. at 324.

The evidence must be viewed in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *Kenney v. Swift Transport, Inc*., 347 F.3d 1041, 1044 (8th Cir. 2003). "In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations." *Id.* "Where the unresolved issues are primarily legal rather than factual, summary judgment is

particularly appropriate." *Koehn v. Indian Hills Cmty. Coll.*, 371 F.3d 394, 396 (8th Cir. 2004). Despite Ellison's and Simmons's contention that the rubrics for reviewing a motion for summary judgment in an employment case are more stringently applied, the Supreme Court has reiterated that district courts should not "treat discrimination differently from other ultimate questions of fact." *Togerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011), *quoting Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S.133, 148 (2000).

## III. Discussion

Numerous Walmart policies set out how associates should and should not relate to one another. In Walmart's Statement of Ethics, the following is stated about the boundaries of those relationships:

> **Personal relationships with other associates**. At Walmart, we want to provide a work environment where associates can perform effectively and achieve their full potential. We are all responsible for creating a climate of trust and respect, and for promoting a productive work environment. There is a basic conflict of interest when you manage someone with whom you have a family, romantic, or dating relationship. Even if you're acting properly, your relationship will likely be seen as influencing your judgment. This can damage morale and disrupt workplace productivity. Therefore, you may not supervise, directly or indirectly, any family members or any associate with whom you date or are romantically involved. This includes situations where you may be able to influence that associate's terms and conditions of employment, or if that associate can influence the terms and conditions of your

14

employment.     Walmart    strives    to   eliminate
personal relationships that interfere with work
performance or which may constitute harassment.
You should ask for guidance and advice from your
manager or from an in-country Ethics Committee
whenever an issue comes up regarding a personal
relationship.    Your manager or Human Resources
manager can discuss options with you, such as a
possible transfer to remove the conflict.
(Doc. 23-6, Ex. 1).

Walmart's Workplace Standards Policy states:

**Relatives and romantic relationship partners.**
All associates and applicants will be considered
for employment (or a new position) without regard
to   whether   a   *family   member*   or   *romantic
relationship   partner*   of   the   associate   or
applicant is employed by us. No employee or
applicant may be considered for or placed in a
position where the associate's supervision of
that individual would create an actual or
perceived conflict of interest, or where such
placement would adversely impact protection of
our assets.   Examples of situations to avoid
include, but are not limited to:

- A *romantic relationship* with another
  associate when one associate supervises or
  can influence the terms or conditions of
  the other associate's employment.
- Associates' *family members* or romantic
  relationship partners placed in positions
  that would involve the associates handling
  or processing the same funds that would
  compromise the "chain of security."
- Associates participating in an
  investigation or a performance evaluation
  involving *family members* or romantic
  relationship partners.

*Family Member,* for purposes of this policy, means
your relative, whether by birth, adoption,
marriage, domestic partnership or civil union,
including spouse, children, parents, siblings,
grandparents or grandchildren and, in the state
of Hawaii, reciprocal beneficiaries.

15

> *Romantic relationship* means a consensual relationship between individuals of a romantic or intimate nature.
>
> *Romantic relationship partner* means one of the individuals in a romantic relationship.

When a supervisory relationship exists between two associates who are related or who desire to pursue a romantic relationship, one of the associates must disclose the existence of the relationship to an appropriate salaried member of management and request a transfer for one of the individuals involved to eliminate the supervisory relationship. If a transfer is permitted, the transferred associate will receive the wages, hourly schedule that are appropriate for the new position. Such a transfer will be permitted only when:

- The associate makes the transfer request prior to an allegation and/or investigation of a potential violation;
- An appropriate position is available; and
- The associate seeking the transfer assumes all expenses, including relocation costs, related to the transfer.

(Doc. 23-7, Ex. 2)(emphasis in the original).

Walmart's General Work Rules and Guidelines for

its Field Logistics division states:

> **Romantic Relationships**. Walmart associates are expected to conduct themselves in a manner that promotes respect, trust, safety and efficiency in the workplace. It is against Company policy for a manger or supervisor to become romantically involved with an associate he or she supervises or with an associate whose terms and conditions of employment he or she may have the ability to influence. Associates who violate this policy will be subjected to immediate termination of employment.

(Doc. 23-8).

16

Walmart has a chart that sets out what kinds of relationships associates are allowed to have depending on their position with the company.  The "Optical Lab Matrix" covers the Optical Lab and Distribution Centers.  It states:

- General Manager...No relatives permitted to work in the facility.
- Co-Manager...No relatives permitted to work in the facility.
- Area Manager Level 2...No relatives permitted to work on their shift.
- Area Manager Level 1...No relative permitted to work in their area of responsibility.
- Maintenance Manager...No relatives permitted to work in their area of responsibility.
- Maintenance Supervisor...No relatives permitted to work in their area of responsibility.
- Process Control Manager...No relatives permitted to work in the facility.
- QA Manager... No relatives permitted to work in the facility.
- Supervisor...No relatives permitted to work in their area of responsibility.  Supervisor responsible for Process Control or QA no relative permitted to work on their shift.
- Process Control Associate.... No relatives permitted to work on their shift.
- QA Associate...No relatives permitted to work on their shift.
- Asset Protection Associate...AP Hourly Associates are permitted to have relatives work within the facility.
- AP Manager...AP Managers can have no relatives working in the building.
- Human Resource Manager...No relatives permitted to work in the facility.
- HR Hourly Associate..Relatives will be permitted.
- Training Coordinator...Relatives will be permitted.

17

- If any Associate is involved in a situation (hiring, evaluation, coaching, investigation, etc.) regarding his/her relative he/she must remove/excuse himself/herself from the investigation/decision making situation.
- Exceptions to the policy, based on extenuating circumstances, may be made by the Senior HR Manager supporting the Optical Labs/DC group.

(Doc. 17-3, Ex. 23).

The Field Logistics Matrix provides:

- General Manager/General Transportation Manager/Assistant General Manager...No relatives permitted to work in the facility, which entails entire scope of responsibility.
- Operations Manager/Area Manager...No relatives permitted to work in their area of responsibility.
- Asset Protection...AP Hourly associates are permitted to have relatives work within the facility.
- Asset Protection Manager...AP Managers can have no relatives working in the DC (both Operations & Area level AP Managers).
- HR Manager...No relatives permitted to work in the facility.
- HR Office Clerical/Training Manager/HR Office Manager/Employment Manager/HR Office Manager/Training Manager...Relatives will be permitted, except within the HR function.

(Doc. 23-9, Ex. 3).

When Simmons was hired as the first Human Resources Office Manager for the Optical Lab, she understood her job description to be, as far as she knew, the same as that for HROM in the Logistics Division of Walmart, where she worked prior to moving to the Optical Lab/Call Center in Arkansas. Simmons's

18

supervisor, Braun, explained that since the position was new there they would have to "tweak it as it goes." She was told that she would be in charge of the HR office and the associates in that office and support the overnight[14] managers who were in the building. There was a two hour time period between the time Braun left for the day and the Call Center closed at 8:00 p.m. when Simmons was "the only person in the building" available to handle HR issues for the entire building, which would have included the Call Center Manager. Since Simmons worked the night shift, most of the issues that needed to be addressed had already been discussed throughout the course of the day, but if someone needed to discuss something, they would "absolutely" discuss it with her. (Doc. 17-1, pp. 13-14).

Ellison and Simmons determined that to be married to one another was perfectly acceptable, and that nowhere in Walmart's policies was such a relationship prohibited. Simmons's deposition testimony reveals her views on the subject:

> A: Nowhere in policy does any of that ever form a justification for prohibiting a relationship of any kind.
> Q. Okay.
> A. Okay.
> Q. That--that's your belief.
> A. Yes, ma'am, absolutely.
> Q. And you know Walmart has a different belief?
> A. Well, for five years, Walmart paid me to teach other people about their policies, so I

---

[14] Simmons worked 2:00 p.m. to 12:00 a.m. (Doc. 18).

feel fairly confident in my understanding of
them.
Q.  Okay.
A.  Okay.
Q.  So Linda Braun is wrong.
A.  Absolutely.
Q.  David Finley is wrong.
A.  Yes.
Q.  David Scott is wrong.
A.  Yes.
Q.  Karen Churchman was wrong.
A.  Yes.
Q.  Volker Heimeshoff was wrong.
A.  Yes.
Q.  Dale Henry was wrong?
A.  Yes, ma'am.
Q.  Anybody else you appealed to that was wrong?
A.  I can't think of anyone.  Bryan Miller, did
you say?
Q.  Bryan Miller was wrong?
A.  Uh-huh.
Q.  Okay.  And you're right.
A.  Yes, ma'am.
(Doc. 17-1, pp. 21-22).

Ellison also gave a similar view in his deposition

testimony:

Q.  So you did your own research on the policy?
A.  Yes, ma'am.
Q.  Okay.  And you discounted both Linda Braun's
statement about how the perception would affect
your job and her job and you discounted Dave
Finley's statement about the perception; is that
correct?
A. Policy as written did not apply to Theresa and
myself, in my opinion.
...
Q.  I don't want to know what the policy says.
A.  Yes, ma'am.
Q.  And this says it's against company policy.
A.  Yes, ma'am, it does.
...
Q.  Okay.  So you believe that, I guess it was
David Scott who gave--who wrote this coaching

20

form, was wrong when he said it was against
company policy.
A.  Yes, ma'am.
Q.  Okay.  And you believe everybody up the chain
of command who handled the appeal was wrong in
determining that it violated policy.
A.  Yes, ma'am.
(Doc. 17-1, pp. 41-42).

Simmons had been told at one point that many of the
Logistics Division policies would apply in the Optical Center.
Under the Logistics romantic relationship policy, only
relationships between an associate and their supervisor are
prohibited.  Because Simmons was the first person to hold the
position of Human Resources Office Manager at the Optical
Lab/Call Center, her particular position was not listed on the
Optical Lab matrix.  This left her in, she contends, a no-man's
land when it came to this specific policy.  Except for the fact
that regardless of the specific positions involved, all of
Walmart's policies have the same goal:  to avoid conflicts of
interest and the perception of conflict.

Simmons and Ellison ignored the warnings of their
supervisors and continued to carry on a relationship that caused
obvious[15] problems for their respective departments.

**Sex Discrimination**

---

[15] Paragraph 14 of Simmons's Open Door Complaint to Rueben Perez
states:  "In the face of all of this, it became clear that the
friendship that had formed between Gene and me was causing a
problem...."  (Doc. 23-12)

21

Title VII of the Civil Rights Act of 1964, as amended, prohibits discrimination on the basis of sex: "It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual or to otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's...sex." 42 U.S.C. § 2000e-2(a)(1). The purpose of this provision is to prevent "disparate treatment of men and women in employment," regardless of its form. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78, (*quoting Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57 (1986)). "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale* at 80 (*quoting Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)). The legal standard for gender discrimination is the same for Title VII and the Arkansas Civil Rights Act. *See Maxfield v. Cintas Corp. No. 2,* 427 F.3d 544, 550 (8th Cir. 2005).

The Court analyzes Title VII and ACRA claims like Simmons's, where there is no direct evidence of discrimination, under the familiar *McDonnell Douglas* burden-shifting framework. *Clegg v. Arkansas Dep't of Correction,* 496 F.3d 922, 926 (8th Cir. 2007). To make a *prima facie* case of gender discrimination,

22

Simmons must show that she: "(1) is a member of a protected class; (2) was qualified for her job; (3) suffered an adverse employment action; and (4) alleged facts that give rise to an inference of gender discrimination." *Norman v. Union Pacific R.R. Co.,* 606 F.3d 455, 460-461 (8th Cir. 2010). If Simmons makes her *prima facie* case, then the burden of production shifts to Walmart to offer some legitimate, nondiscriminatory reason for firing her. *Tyler v. University of Arkansas Board of Trustees,* 628 F.3d 980, 990 (8th Cir. 2011). Simmons must then show that Walmart's proffered reason was pretextual and that unlawful discrimination was instead a motivating factor. *Ibid.*

Simmons has failed to make a prima facie case of sex discrimination. She is a member of a protected class and did in fact suffer an adverse employment action (suspension and ultimately termination). Although Walmart contends she was not meeting its legitimate job expectations because she failed to disclose her relationship with Ellison in accordance with its policy and did not otherwise comply with the company's Statement of Ethics, one could, for the sake of argument and viewing the facts in a light most favorable to Simmons, contend that she was qualified for her job. The insurmountable hurdle for Simmons is that there are *no* facts which infer gender discrimination. In an appropriate case, evidence that a gender neutral-anti-nepotism policy is applied in a manner that disproportionately

23

impacts women may give rise to an inference of sex-based discrimination without proof of discriminatory intent.  The key here is that  Simmons suffered the exact same adverse employment action as Ellison, a male.

Both before and after *Oncale*, the Eighth Circuit has noted that because Title VII is premised on eliminating discrimination*,* inappropriate conduct that is inflicted on both sexes, or is inflicted regardless of sex, is outside the statute's ambit.  *Holman v. Indiana*, 211 F.3d 399, 403 (8th Cir. 2000).  Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at "discriminat[ion]...because of...sex...." "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale,* 523 U.S. at 80.  "Title VII should not be 'unwittingly expanded to impose liability on employers for condoning or not remedying offensive co-worker conduct that does not amount to discrimination 'because of...sex[.]'" *Anderson v. Family Dollar Stores of Arkansas, Inc.*, 579 F.3d 858, 863 (8th Cir. 2009)(*quoting Excel Corp. v. Bosely*, 165 F.3d 635, 641 (8th Cir. 1999).

There is no suggestion in the record that any of the rumors or statements concerning Ellison's and Simmons's affair

24

were made *because* Simmons was female.  By the very nature of such gossip, *both* Simmons and Ellison were made the subject matter.  Both men and supposedly women participated in the speculation.  The rumors spread, irrespective of the truth, for any number of reasons, none of which had to do with sex discrimination.  There are many motives for spreading slanderous rumors in the workplace, but gender generally is not one of the motives, and it does not appear to be so here.  Each of the gender-neutral incidents that Simmons complains of are the sort of minor indignities that are not actionable under Title VII.  *See Oncale*, 523 U.S. at 81.

Assuming a plaintiff establishes a prima facie claim for discrimination, the burden shifts to the defendant to show a legitimate, non-discriminatory reason for the adverse employment action taken. The Court finds that Walmart has met this burden. Walmart has several policy statements in effect that show their intention to prevent conflicts of interest and avoid the perception of impropriety.  All of Defendant's witnesses testified that they believed one or more of the company policies prohibited Simmons and Ellison from being involved in a romantic relationship or that, at the very least, Simmons should have spoken to her supervisor directly for clarification in compliance with the company's general Statement of Ethics.  At all times during the investigation and afterward, Walmart

leadership represented to Simmons and Ellison that they were being discharged for violation of the company's romantic relationship policy. (Docs. 24-1, 24-2). Although the term "dishonesty" was not used in the plaintiffs' Coaching documents, Walmart's response to interrogatories indicates that Simmmons and Ellison were discharged, at least in part, because of their dishonesty. (Doc 23-1, ¶1).

The defendant's burden at this stage is one of production and not proof. *Britton v. City of Poplar Bluff,* 244 F.3d 994, 996-97 (8th Cir. 2001)(*citing Krenik v. County of Le Sueur,* 47 F.3d 953, 958 (8th Cir.1995); *Fuller v. Alliant Energy Corporate Servs.,* 456 F.Supp.2d 1044, 2006 U.S. Dist. LEXIS 75497, 35 (N.D.Iowa 2006)("Because adverse employment actions almost always involve a very high degree of discretion, and most plaintiffs involved in employment discrimination cases are at will, it is a simple task for employers to concoct plausible reasons for virtually any adverse employment action ranging from failure to hire to discharge."). It is undisputed that Simmons and Ellison were involved in a romantic relationship.[16] Walmart clearly has policies related to romantic relationships between coworkers.   The Eighth Circuit has consistently held that

---

[16] Plaintiff testified that "I still take exception to the [phrase] 'became romantic,' because I am not sure what you mean by that.  We decided sometime between March and May to get married, that we cared very much for each other...." (Doc. 17-1, p. 20).

"violating a company policy is a legitimate, non-discriminatory rationale for terminating an employee." *Twymon v. Wells Fargo & Co.,* 462 F.3d 925, 935 (8th Cir. 2006).

Once a defendant establishes a legitimate, non-discriminatory reason for an employee's termination, the burden then shifts back to the plaintiff to show that the defendant's explanation for terminating her employment is pretextual. The plaintiff's burden at this stage is more onerous, "merg[ing] with the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." *Dixon v. Pulaski County Special Sch. Dist.,* 578 F.3d 862, 868 (8th Cir.2009)(*citing Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256 (1981)). Simmons must demonstrate that Walmart's proffered reason for terminating her was not the true reason, but rather was a pretext for discrimination. *Dixon,* 578 F.3d at 868. She may do so "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' *Hammer v. Ashcroft,* 383 F.3d 722, 724 (8th Cir. 2004)(*quoting Burdine,* 450 U.S. at 256). Simmons attempts to show pretext by arguing that there was no direct company policy that applied to their relationship and it was none of Walmart's business whether they were dating or married. (Doc. 26). To succeed under this construct, Simmons "must

27

adduce enough admissible evidence to raise genuine doubt as to the legitimacy of [Walmart's] motive, even if that evidence does not directly contradict or disprove [Walmart's] articulated reasons for its actions." *Dixon,* 578 F.3d at 870 (citation and quotation omitted).

The tone of Simmons's pleadings and testimony appears to be an attempt to show that she was investigated because she complained to her supervisor about comments people were making about her and then she was fired in retaliation for filing an Open-Door complaint, while similarly situated employees were treated more favorably. "Instances of disparate treatment can support a claim of pretext, but [plaintiff] has the burden of proving that he and the disparately treated [employees] were similarly situated in all relevant aspects." *McNary v. Schreiber Foods, Inc.,* 535 F.3d 765, 770 (8th Cir. 2008)(*quoting Sherman v. Runyon,* 235 F.3d 406, 409 (8th Cir. 2000) (citation omitted)). The burden for Simmons to show that she was "similarly situated to more leniently treated employees in 'all relevant respects' is a 'rigorous' standard at the pretext stage." *Anderson v. Durham D & M, L.L.C.,* 606 F.3d 513, 521 (8th Cir. 2009)(*quoting Wimbley v. Cashion,* 588 F.3d 959, 962 (8th Cir. 2009)). Simmons acknowledged that the reason she was given by Walmart for prohibiting a relationship with Ellison was that if anyone from his group thought they were having a

relationship, they would not feel comfortable coming to her with an issue involving him. (Doc. 23-12, p. 1). Ellison testified that Simmons was over the team that provided services to his associates in the Call Center. (Doc. 22-5, p. 75).

Even if the Court were to assume Simmons established a causal connection between her Open Door complaint and her suspension and termination, she cannot demonstrate that Walmart's explanation for termination was pretextual.

In her initial Open Door complaint, Simmons pointed out other relationships within Walmart:

- L.B., (female) HR Manager, takes breaks and lunch with K.S., (female) lab manager, on a regular basis. (Doc. 23-12)

- K.S. (female) is also "very good friends" with R.C.(male).

- B.K., (male)Area 2 Manager, plays golf with D.H., (male) manager to whom he directly reports.

- D.H. (male) also plays golf with hourly supervisor R.W. (female).

(Doc. 23-12).


Simmons directs the Court to more alleged relationships within Walmart in her response to Walmart's Motion for Summary Judgment.

29

- J.L.[17] (male) inspected product created by the Optical Lab, including products initially inspected by his wife. When their marriage became an issue, J.L. was temporarily re-assigned until such time as his wife found another position within the Optical Lab. (Doc. 25).

- B.K.[18] (male) Area 2 Level Manager whose wife worked for the Call Center at the Optical Lab.

- B.C.[19], (male) Optical Lab manager, was at one time accused of having a romantic relationship that violated policy. After he demanded to see the policy he was accused of violating, the matter was dropped.

---

[17] Walmart states that after a complaint was made to J.L.'s manager that there was a perception by associates in the Fayetteville Optical Lab that J.L. could show favoritism to his wife concerning audits of her department's work, J.L.'s supervisor assigned another field quality assurance manager to audit the Fayetteville Optical Lab until his wife stepped down from her supervisory position to an hourly quality assurance position. (Doc. 18).

[18] Walmart states that before applying for the Level 2 Manager position, B.K. asked the General Manager, Tommy Hyde, if he could hold that position since his wife worked in the Call Center. Hyde told him that he could do so. (Doc. 18).

[19] Walmart states that B.C. was interested in dating an Asset Protection Associate. He asked Optical Lab Co-manager Vic Tumlinson whether dating her would create a problem. Tumlinson told him it would. B.C. testified that he did not engage in a relationship with the associate until after she changed positions. General Manager Hyde and Tumlinson questioned B.C. about whether he had misrepresented the nature of his relationship with the associate. B.C. told them that he had not lied. They were married shortly thereafter.

- L.B. (female) at one time tried to get her husband
  hired on in the Call Center.

(Doc. 25).

There is simply no evidence that these individuals were similarly situated to the Simmons in all relevant respects, as these individuals did not work under the same supervisor, work in the same department or have the same responsibilities as Simmons. *See Hervey v. County of Koochiching,* 527 F.3d 711, 720 (8th Cir. 2008) ("[T]he individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.") (*quoting Clark v. Runyon,* 218 F.3d 915, 918 (8th Cir. 2000)), *cert. denied,* 555 U.S. 1137 (2009). Furthermore, and pointing out the obvious, Simmons complains that she has been treated differently from both *men and women.* Ellison's recollection does not help Simmons's case any. In Ellison's statement of October 7, 2010, following his conversation with David Scott about the investigation, he states: "It seems that around this time (when his supervisor told him there was a problem with the 'perception' of a relationship between Ellison and Simmons) I had started to feel that Theresa and I were being treated differently than other managers in the facility and there were restrictions being put on us and our friendship that was never a

31

question with other manager's friendships with other managers
and or hourly associates....It appears to me that there was a
double standard being applied." (Doc. 17-2, p. 80).

Simmons claims that Walmart did not perform an adequate
investigation of her complaints of mistreatment, instead
focusing their attention on the relationship between Simmons and
Ellison.  The Court finds this argument unavailing.  An employer
"can certainly choose how to run its business, including not to
follow its own personnel policies regarding termination of an
employee or handling claims of discrimination, as long as it
does not unlawfully discriminate in doing so." *Haas v. Kelly
Servs., Inc.,* 409 F.3d 1030, 1036 (8th Cir. 2005).  The record
shows that Walmart conducted a thorough investigation of
Simmons's grievances:  there are pages of notes from interviews
with supervisors and a chart detailing each of Simmons's Open
Door concerns, the result of the investigation and action plan
going forward.[20] (Doc. 24-4).

**<u>Retaliation</u>**

---

[20] Walmart's action plan included adding the Human Resources
Office Manager to the Optical Lab Policy as being prohibited
from having relationships within the facility, engaging in
ongoing conversation with management team about leadership,
continuing to investigate the top leadership team, clarifying
with the Call Center team how HR support is provided, and
coaching one of Simmons's supervisors for mistreating her during
a coaching conversation.  (Doc. 24-4).

Simmons contends that she had no disciplinary history with Walmart until she made her "complaint of sex discrimination to her supervisor, Braun," and that she was disciplined and ultimately terminated because of her complaints of discrimination. Ellison contends that he also had no disciplinary history with Walmart until Simmons made her complaints of discrimination and that he was disciplined and ultimately terminated because of the complaints made by Simmons and his relationship with Simmons. (Doc. 1).

Indirect evidence of retaliation is also analyzed using the *McDonnell Douglas* burden shifting framework. *McLain v. Andersen Corp.,* 567 F.3d 956, 969 (8th Cir. 2009). A *prima facie* case of retaliation requires (1) engagement in a protected activity; (2) suffering an adverse employment action and (3) a causal connection. *Arraleh v. County of Ramsey,* 461 F.3d 967, 977 (8th Cir.2006). "[T]emporal proximity alone is generally insufficient to prove pretext." *Id.* at 978. If the plaintiff demonstrates a *prima facie* case, the burden shifts to the defendant to articulate a legitimate reason for the action. *McLain,* 567 F.3d at 969. The burden then shifts back to the plaintiff to show evidence that the reason was pretextual. *Id.*

Simmons's and Ellison's claims of retaliation fail for the same reasons Simmons's discrimination claim fails. The only link between their adverse employment actions and Simmons's arguably

protected conduct is time, and that simply is not enough, particularly in light of the fact that Plaintiffs' complaints to management were about a myriad of indignities, none of which were gender-based.

**IV.  Conclusion**

Accordingly, Defendant's Motion for Summary Judgment (Doc. 17) is **GRANTED** and Plaintiffs' Complaint (Doc. 1) is **DISMISSED WITH PREJUDICE**.  Each party is to bear their own fees and costs.

IT IS SO ORDERED this 3rd Day of April, 2012.

<u>/s/ Robert T. Dawson</u>
Honorable Robert T. Dawson
United States District Judge

34